**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

**JEREMY K. MAIRIDITH** **MOVANT**

**v.** **No. 1:19CR96-MPM-DAS**

**UNITED STATES OF AMERICA** **RESPONDENT**

## MEMORANDUM OPINION

This matter comes before the court on the motion of Jeremy K. Mairidith to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The government has responded to the motion; Mairidith has replied, and the matter is ripe for resolution. All grounds for relief in the instant motion, except for Mairidith's claim that counsel did not file a Notice of Appeal when requested, will be dismissed. The final issue will be resolved after the court has conducted an evidentiary hearing on the matter, as the allegations involve events outside the record in this case.

## *Habeas Corpus* Relief Under 28 U.S.C. § 2255

The writ of *habeas corpus*, a challenge to the legal authority under which a person may be detained, is ancient. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St. John's L.Rev. 55 (1934). It is "perhaps the most important writ known to the constitutional law of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is equally significant in the United States. Article I, § 9, of the Constitution ensures that the right of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or invasion, public safety may require it. *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56. Its use by the federal courts was authorized in Section14 of the Judiciary Act of 1789. *Habeas*

*corpus* principles developed over time in both English and American common law have since been codified:

> The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the 1948 Judicial Code. The recodification of that year set out important procedural limitations and additional procedural changes were added in 1966. The scope of the writ, insofar as the statutory language is concerned, remained essentially the same, however, until 1996, when Congress enacted the Antiterrorism and Effective Death Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners and setting out special, new *habeas corpus* procedures for capital cases. The changes made by the 1996 legislation are the end product of decades of debate about *habeas corpus*.

*Id*.

**Section 2255 Proceedings**

Section 28 U.S.C. § 2255 permits an inmate serving a sentence after conviction of a federal crime "to move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). As with the writ of *habeas corpus*, *see* 28 U.S.C. §§ 2241, 2254, a § 2255 motion sets forth only four bases on which a motion may be made: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Thus, a prisoner must claim either a constitutional violation or want of subject matter jurisdiction to invoke 28 U.S.C. § 2255. In the absence of constitutional or jurisdictional defects, a federal prisoner may invoke § 2255 only if the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185 (1979).

The district court must first conduct a preliminary review of a section 2255 motion, and "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceeding that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing Section

2255 Proceedings, Rule 4(b). If the motion raises a non-frivolous claim to relief, the court must order the Government to file a response or to take other appropriate action. *Id.* The judge may then require the parties to expand the record as necessary and, if good cause is shown, authorize limited discovery. *Rules Governing Section 2255 Proceedings,* Rules 6–7.

After reviewing the government's answer, any transcripts and records of prior proceedings, and any supplementary materials submitted by the parties, the court must decide whether an evidentiary hearing is warranted. *Rules Governing Section 2255 Proceedings,* Rule 8. Under the statute, an evidentiary hearing must be held unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, the court need not hold an evidentiary hearing if the prisoner fails to produce "independent indicia of the likely merit of [his] allegations." *United States v. Edwards,* 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes,* 132 F.3d 1106, 1110 (5th Cir. 1998)).

Ultimately, the petitioner bears the burden of establishing his claims of error by a preponderance of the evidence. *See Wright v. United States,* 624 F.2d 557, 558 (5th Cir. 1980). For certain "structural" errors, relief follows automatically once the error is proved. *See Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003). For other errors at the trial court level, the court may grant relief only if the error "had substantial and injurious effect or influence" in determining the outcome of the case. *Brecht v. Abrahmson,* 507 U.S. 619, 637 (1993); *see also United States v. Chavez,* 193 F.3d 375, 379 (5th Cir. 1999) (applying *Brecht's* harmless error standard in a § 2255 proceeding). If the court finds that the prisoner is entitled to relief, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

**Facts and Procedural Posture**[1]

A federal grand jury returned a multi-count indictment on July 24, 2019, charging the petitioner-defendant, Jeremy Mairidith, with various drug trafficking and firearms violations. Mairidith was later charged in Counts 1, 2, 3, and 4 of a 19-count Superseding Indictment filed on September 12, 2019. Count 1 charged the defendant with conspiring with eight other codefendants to possess with intent to distribute 50 grams or more of methamphetamine (actual) and marijuana in violation of Title 21, U.S.C. § 841(a)(1), (b)(1)(A) and 846, which carries maximum possible penalties of not less than 10 years and not more than life imprisonment. Count 2 charged the defendant with aiding and abetting in the possession and distribution of methamphetamine in violation of Title 21, U.S.C. § 841(a)(1), (b)(1)(B), which carries maximum possible penalties of not less than 5 years and not more than 40 years imprisonment. Count 3 charged felon in possession of a firearm in violation of Title 18, U.S.C. § 922(g)(1) and 924(a)(2). Count 4 also charged felon in possession of a firearm in violation of Title 18, U.S.C. § 922(g)(1) and 924(a)(2).

Counts 3 and 4 each carry a maximum possible penalty of not more than 10 years imprisonment. (PSR ¶ 1-6).

**Jeremy Mairidith Drug Trafficking Organization (DTO)**

In 2016, Agents with the ATF and other agencies began investigating a drug trafficking organization (DTO) known to law enforcement as the Jeremy Mairidith DTO. The Mairidith DTO distributed methamphetamine, marijuana, and other controlled substances in the Northern District of Mississippi, Tennessee, and elsewhere. Jeremy Mairidith, a/k/a "Big J," a/k/a "Big Head" was a

[1] The court has drawn the facts and procedural posture from the Government's response to the instant motion to vacate, set aside, or correct sentence, as they are both well-documented and uncontested.

member of the Mairidith DTO. The DTO stored, sold, and distributed methamphetamine, marijuana, and other controlled substances primarily in Lee County, Mississippi, where Mairidith resided. The DTO received pound quantities of methamphetamine and marijuana on a frequent basis from suppliers in Georgia, California, and other areas. (PSR ¶ 14, 15).

**Mairidith's Criminal Conduct**

**Law enforcement made three purchases of methamphetamine from Mairidith and recovered firearms.**

In January 2018, investigating agents made three controlled purchases of methamphetamine (actual) from Mairidith, totaling 457.54 grams. (PSR ¶ 16). On July 25, 2018, Mairidith was arrested by the Tupelo Police Department and charged with being a felon in possession of a firearm. During a traffic stop, a K9 alerted to the odor of narcotics in his vehicle. A search of the vehicle uncovered a loaded Taurus Judge 45/410 revolver. On May 18, 2019, a search warrant was executed at Mairidith's residence, 109 Drive 1417, Tupelo, Mississippi. The empty box for the Taurus revolver was found in his bedroom closet. (PSR ¶ 17, 36). Agents also discovered a Dan Wesson Arms, .357 revolver in the nightstand drawer of his bedroom. (PSR ¶ 36).

**Co-conspirator statements to law enforcement**

**Desmonya Lewis**

Desmonya Lewis, co-defendant, gave statements to investigating agents regarding his methamphetamine trafficking and distribution with Mairidith. Lewis conservatively estimated that over the course of 2018, he purchased approximately 20 pounds of methamphetamine from Mairidith. Lewis gave specific examples of his dealings with Mairidith. (PSR ¶ 19). This information was corroborated by investigating agents through court authorized wire and electronic interceptions among other means.

**Kennoris Hughey**

Kennoris Hughey, co-defendant, gave statements to investigating agents regarding his methamphetamine and marijuana distribution activity with Mairidith. Hughey described himself as a "middleman" of methamphetamine supplied by Mairidith to his customers in Corinth. Hughey described he and his brother, Desmonya Lewis were the primary suppliers of methamphetamine in Corinth in 2017 and 2018. Hughey conservatively estimated Mairidith supplied him with approximately 5 pounds of methamphetamine and smaller quantities of high-grade marijuana. (PSR ¶ 20). Investigating agents were able to corroborate Hughey's statement through court authorized wire and electronic intercepts among other means.

**Stefanie Johnson**

Stefanie Johnson, co-defendant, testified under oath in the trial of Mairidith's coconspirator Samuel Wilson. The substance of her testimony at Wilson's trial was contained in Mairidith's PSR. Johnson advised law enforcement agents and testified Mairidith supplied her with approximately 3.5 pounds of methamphetamine and 10 pounds of marijuana in November and December 2018. Johnson testified on one occasion Mairidith used Wilson to deliver methamphetamine to her for him. During this delivery of methamphetamine, Wilson was armed with a pistol. Mairidith also offered to help Johnson "handle" any problems with her ex-husband, referring to Wilson as "Mr. Clean" for his reputation for committing acts of violence on behalf of Mairidith. (PSR ¶ 21).

**Wire and Electronic Intercept Evidence**

During the course of the investigation, wire and electronic interceptions were authorized by the Court. Mairidith was the primary target of these wiretaps. (PSR ¶ 18). The PSR contained excerpts from several of Mairidith's communications and painted an accurate portrait of some of Mairidith's drug trafficking activity. (PSR ¶ 18, 22-29, 31). Specifically, Wilson and Mairidith

discussed two confidential informants they believed were providing information to law enforcement. Mairidith and Wilson discussed a plan to lure each of them to a location where they would be killed. (PSR ¶ 22). These phone calls prompted investigating agents to take immediate action to secure the safety and well-being of these two informants. Wilson was subsequently arrested a short time later at 104 Willow St., Shannon, Mississippi, in the presence of Dmitri Kimble, a co-conspirator and drug supplier from Atlanta. Wilson was found to be in possession of three firearms. (PSR ¶ 23). During the execution of a search warrant, agents found approximately 230 grams of marijuana and approximately 31.60 grams of heroin in the residence. (PSR ¶ 23). In the days following Wilson's arrest, Mairidith was intercepted speaking to Dmitri Kimble about the events that transpired. Mairidith was particularly concerned about who "took up for" the firearms and drugs found in the residence. (PSR ¶ 23).

Additional communications intercepted from May 1, 2019, to May 18, 2019, revealed Mairidith used his residence, 109 Drive 1417, Tupelo, MS to store and distribute drugs and money. Agents intercepted communications between Mairidith and a co-conspirator from Georgia known as Cedric Wiggles, a/k/a "Swoop." Agents observed "Swoop" and Mairidith discuss narcotics transactions and meet at Mairidith's residence. (PSR ¶ 25-27). Agents also obtained photographic evidence of large amounts of cash displayed on Mairidith's kitchen table at this location. This money was going to be used for the additional purchase of multiple kilograms of methamphetamine, however Mairidith and his co-conspirators were arrested before the deal could be consummated. (PSR ¶ 27).

In early May 2019, Mairidith contacted his co-defendant, Eiko Jones, and solicited funds for the purchase and acquisition of methamphetamine from a new supplier in California. Jones and Mairidith then traveled to California and met with suppliers who agreed to provide 2 KG of

methamphetamine followed by an additional 10 KG. (PSR ¶ 32). Mairidith and Jones returned from California accompanied by their new source of supply, Fernando Gonzalez. Gonzalez stayed with Mairidith at his residence, 109 Drive 1417, Tupelo, Mississippi. While there, Mairidith and Jones gathered additional money to pay for the additional shipments of methamphetamine scheduled to arrive from California. (PSR ¶ 27).

On May 18, 2019, federal agents identified and secured Mairidith's drug shipment as it arrived from California. Agents executed a federal search warrant at the Tupelo Post Office and found the package contained approximately 2 KG of methamphetamine. A controlled delivery of the methamphetamine was conducted at Mairidith's former residence, currently occupied by his sister, located at 150 Texas Avenue, Tupelo, Mississippi. Shortly after the controlled delivery of the methamphetamine, Mairidith, Jones and Gonzalez arrived in Mairidith's vehicle with Mairidith driving. Mairidith retrieved the methamphetamine and placed it in the trunk of the car. Agents attempted to stop Mairidith, but he refused and led multiple law enforcement officers and vehicles on a high-speed chase. Mairidith only stopped his vehicle because he ran out of gas and could not continue to flee. (PSR ¶ 34).

**Mairidith's Counsel**

Upon indictment on the federal charges, Mairidith retained attorney John Patrick Robbins. (Doc.11). Shortly thereafter, Robbins was allowed to withdraw his representation. (Doc. 142, 146). Whitman D. Mounger was then appointed by the Court to represent Mairidith. (Doc. 151). Mounger was also allowed to withdraw several days later. (Doc. 152, 157). David G. Hill was then substituted and appointed counsel by the Court. (Doc. 157). Mr. Hill remained counsel of record through Mairidith's guilty plea and sentencing.

**Change of Plea Hearing**

On November 18, 2021, pursuant to a plea agreement and supplement, Mairidith pleaded guilty to a *lesser* included offense of Count 1 of the Superseding Indictment, conspiracy to possess with intent to distribute methamphetamine and marijuana in violation of Title 21, U.S.C. § 841(a)(1), (b)(1)(C). The *lesser* included offense carried no mandatory minimum sentence, and a statutory maximum term of imprisonment of 240 months. This was a significant statutory reduction from Count 1 of the Superseding Indictment which charged an offense that carried a term of imprisonment of not less than 10 years and not more than life imprisonment. (PSR ¶ 8).

At the change of plea hearing, the court advised Mairidith of his rights, including whether he had fully discussed his case with his attorney, and whether he was fully satisfied with counsel's representation and advice. (Plea Tr. 5). When asked by the court whether he had been threatened or forced into pleading guilty, or whether anyone made any promises other than the plea agreement to cause Mairidith to plead guilty, he answered in the negative. (Plea Tr. 5-6). The government then presented: (1) the elements of the *lesser* included offense that must be proved; (2) the maximum possible penalties; (3) the substance of the plea agreement and the inclusion of a plea supplement; and (4) the factual basis of proof. Mairidith stated to the court he understood, agreed, and was voluntarily pleading guilty. (Plea Tr. 5-16).

**The Pre-Sentence Investigation Report**

Following Mairidith's guilty plea, the United States Probation Service prepared its Pre-Sentence Investigation Report (PSR). The PSR held Mairidith responsible for 2431.54 gm of methamphetamine (actual), 12,700 gm of methamphetamine and 25,200 gm of marijuana. Under USSG §2D1.1, the United States Probation Office converted the drug weight and calculated

Mairidith's base offense level to be 36. (PSR ¶ 45). Mairidith received an additional two points for possession of a dangerous weapon (firearm) under USSG §2D1.1(b)(1).

Mairidith also received an additional two points for his discussions related to the murder of two confidential informants pursuant to USSG §2D1.1(b)(2). (PSR ¶ 46, 47). He received a two-point enhancement for maintaining a premises for the purpose of distributing a controlled substance (stash house) under USSG § 2D1.1(b)(12). (PSR ¶ 48). Mairidith was found to be an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, resulting in a four-level increase pursuant to USSG §3B1.1(a). (PSR ¶ 50).

As he created a substantial risk of death or serious bodily injury to another person in the course of fleeing from law enforcement, two levels were added pursuant to USSG §3C1.2. (PSR ¶ 51).

Mairidith was also determined to be a career offender due to his prior felony history of controlled substance offenses, which resulted in a total offense level of 48 before acceptance of responsibility. (PSR ¶ 53). He also received the benefit of Chapter 5, Part A (comment n.2) which reduced his total offense level to 43. (PSR ¶ 56).

Mairidith's criminal convictions resulted in a criminal history score of 11 and established a criminal history category VI. (PSR ¶ 67-70). Based upon a total offense level of 43 and a criminal history category VI, the PSR calculated his guideline imprisonment range at life.

However, because counsel negotiated a plea to the *lesser* included offense with a statutory maximum of 240 months, the applicable guideline imprisonment range became 240 months. (PSR ¶ 96). The PSR noted the impact the negotiated plea agreement could have on Mairidith's sentence as it restricted his original guideline imprisonment range of life down to 240 months. (PSR ¶ 97). As counsel noted in his affidavit, the 240-month sentence (after the 40-month downward variance)

corresponds to a Guideline Level of 31 (rather than the Level of 43, Mairidith's *actual* Guideline level). Doc. 588-3, p. 2.

**The Sentencing Hearing**

On May 19, 2022, the court conducted a sentencing hearing. The government made no objections to the PSR. Mairidith had initially filed multiple objections to the PSR. (Docs. 523). However, at the beginning of the hearing, he advised the Court that he wished to withdraw his objections, and the court granted the request. (Sent. Tr. 3). Mairidith and his counsel addressed the court and made remarks in mitigation. (Sent. Tr. 4-7).

The court adopted the PSR without change, noting, however, "…I do intend to make one change later in my remarks." (Sent. Tr. 7). The court considered and discussed the 18 U.S.C. § 3553(a) factors. (Sent. Tr. 7-9). The court then discussed its reasoning for striking a prior felony conviction Mairidith received in Lee County – and ordered the recalculation of Mairidith's guidelines range, which resulted in a criminal history category V instead of VI – with the same restricted guideline range of 240 months imprisonment. (Sent. Tr. 9-10). In pronouncing sentence, the court noted that Mairidith had been "honest with the Court…and I think you should get some credit for that." (Sent. Tr. 11). The court sentenced Mairidith to 200 months, a variance of 40 months below the recommended guideline range.

**The Instant Motion to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255[2]**

---

[2] In presenting his grounds for relief, Mairidith combined multiple issues within a single ground. In the interest of clarity, the court has presented each issue separately and numbered them accordingly.

On June 12, 2023, Mairidith filed the instant Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255, alleging many of the same issues he withdrew at the sentencing hearing:

**Issue No. 1:**

Counsel provided ineffective assistance by advising him to enter a guilty plea (which resulted in a below-guideline sentence.)

**Issue No. 2:**

Counsel provided ineffective assistance by failing to object to a four-point enhancement for his role as an organizer or leader of criminal activity.

**Issue No. 3:**

Counsel provided ineffective assistance by failing to object to the inclusion of certain prior marijuana convictions in the computation of his criminal history category.

**Issue No. 4:**

Counsel provided ineffective assistance by failing to object to a two-level enhancement for possession of a dangerous weapon (firearm).

**Issue No. 5:**

Counsel provided ineffective assistance by failing to object to a two-level enhancement for directing the use of violence.

**Issue No. 6:**

Counsel provided ineffective assistance by failing to object to a two-level enhancement for maintaining a premises for the purpose of distributing a controlled substance.

**Issue No. 7:**

Mairidith asserts counsel provided ineffective assistance because he failed to request a sentence departure.

**Issue No. 8:**

Mairidith asserts counsel was ineffective because he failed to file a notice of appeal.

**Ineffective Assistance of Counsel**

All of Mairidith's grounds for relief are presented in terms of ineffective assistance of counsel. The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.

The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). Indeed, counsel's strategic decisions after thorough investigation are nearly unassailable:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-691).

To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally

unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011). Relevant in the present case, attorneys are not required by the Sixth Amendment to file meritless motions or raise meritless objections. *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995); *Koch v. Puckett,* 907 F.2d 524, 527 (5th Cir.1990). *See Clark v. Collins*, 19 F. 3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering, it is the very opposite.")

**Counsel's Representation as to Grounds 1 Through 7 Was Exemplary**[3]

As discussed below, counsel's representation of Mairidith demonstrated not merely competence, but skill as to both strategy and negotiation.

**Grounds 1 Through 7 Represent Matters of Legal Strategy**

As the Supreme Court has made clear, when considering a claim of ineffective assistance of counsel, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *See Strickland, supra*. Mairidith has not alleged that counsel failed to conduct a thorough investigation, and counsel's command of the facts and law was evident at all stages of the proceedings.

Grounds 1 through 7 clearly represent matters of trial strategy. Ground 1 involves advising the defendant regarding whether to plead guilty. Grounds 2 – 6 involve the decision whether to object to

---

[3] As Ground 8 alleges facts not contained in the court record, it will be resolved after the court conducts an evidentiary hearing on the matter.

various parts of the PSR. Ground 7 involves the decision whether to request a downward departure. Each of these grounds for relief challenge a strategic decision counsel made, and, as discussed below, counsel's decisions fall well within the bounds of competent representation.

**Mairidith's Grounds 1 Through 7 Are Meritless**

Mairidith's claims in Grounds 1 through 7 alleging deficient performance are meritless, as counsel secured an extremely favorable sentence given the egregious facts of this case, as detailed above. Counsel's strategic decisions and advice were based on over 40 years of experience representing criminal defendants, and the results of the plea negotiations and ultimate sentence reflect that experience.

Counsel negotiated a plea of guilty to a single count, the *lesser* included offense, and correctly informed Mairidith of the statutory maximum sentence for that charge. (Hill Aff. p. 1). Indeed, based upon counsel's negotiations, Mairidith's exposure was reduced from a statutory minimum term of 10 years – with a maximum term of life imprisonment – to a statutory maximum term of 240 months, with no minimum. The negotiated statutory maximum of 240 months operated as a cap on the sentence available to the court – as noted in the PSR.

Counsel also advised Mairidith to "withdraw and abandon various objections…to the PSR…as a matter of strategy to lower his sentence."[4] (Hill Aff. p. 2). Mairidith received a variance of 40 months *below* the recommended guideline range of imprisonment. He has not identified any aspect of counsel's performance to suggest it fell below an objective standard of reasonableness. Mairidith's claims of ineffective assistance are contrary to the facts and evidence contained in the PSR

[4] In any event, as discussed below, given the evidence available to the Government (referenced in the PSR), the objections were without merit, or, at best, tenuous.

(and available to the Government should the case have gone to trial) – facts and evidence Mairidith agreed upon during his change of plea hearing.

**Mairidith's Individual Grounds 1 Through 7**

In addition to counsel's overall satisfactory performance, his strategic decisions regarding Grounds 1 through 7 were also sound, as discussed below.

**Ground 1: Advising Mairidith to enter a guilty plea to the lesser included offense**

As discussed at length above, Mairidith initially faced a sentence ranging from 10 years to life imprisonment. Further, as noted in the PSR and summarized above, the Government had more than ample evidence available to support Mairidith's conviction for the initial charge, and he agreed with the summary of that evidence during his change of plea hearing. Mairidith has not alleged any facts suggesting that he would have enjoyed a more favorable outcome had he chosen to reject the plea agreement and take the case to trial. As such, he has shown neither deficient performance by counsel nor prejudice suffered due to counsel's decisions.

Mairidith also alleges in his memorandum [576] in support of his § 2255 motion that counsel assured him that he would receive either time served – or a maximum of 60 months' imprisonment – if he accepted the plea agreement. This factual allegation appears to be part of Ground 1; hence, the court will include this allegation in that discussion.

This allegation is contrary to the express terms of his plea agreement and supplement – his testimony during his change of plea hearing – and his counsel's affidavit. Mairidith has only his bald assertion to support his allegation to the contrary.

Mairidith's Plea Agreement reads, in relevant part:

> No other agreements; Defendant is in Fact Guilty. Apart from being advised of the applicability of the U.S. Sentencing Guidelines, and other than as set forth elsewhere i[n] the plea documents, no promise or representation whatsoever has been made to the defendant as to what punishment the court might impose if it accepts the plea of guilty. This agreement fully reflects all promises, agreements and understandings between the defendant and the United States Attorney. The defendant's agreement is knowing, free and voluntary, and not the product of force, threat, or coercion. The

> defendant is pleading guilty because the defendant is in fact guilty.

Doc. 456, p. 2-3. The Plea Supplement contains similar language:

> There is no agreement as to the sentence to be imposed, which will be in the sole discretion of the Court subject to the advisory Federal Sentencing Guidelines and any statutory minimums, which have been explained to the defendant by defendant's attorney. Both parties reserve the right to speak at sentencing.

Doc. 457, p. 3.

During the change of plea hearing, there was an exchange between the Government, the court, and the defendant regarding whether anyone had promised or represented to him what his sentence would be:

> **Mr. Doleac:** Apart from being advised of the sentencing guidelines, and other that as set forth elsewhere in the plea documents, no promises or representations have been made to [Mairidith] about what punishment the Court might impose if it accepts the plea of guilty.
>
> This agreement is knowing, free, and voluntary and not the product of force, threat, or coercion ….
>
> **The Court:** All right.
>
> Mr. Mairidith, you heard the prosecutor state his understanding – excuse me – of the agreement that you entered into with the Government. Did he accurately state it as you understand it to be?
>
> **The Defendant:** Yes, sir.
>
> **The Court:** And is that your understanding, Mr. Hill?
>
> **Mr. Hill:** It is, Judge, yes.
>
> …
>
> **The Court:** The U.S. Sentencing Commission has issued guidelines for judges to follow in determining the sentence in a criminal case. These guidelines are advisory. Have you and Mr. Hill talked about how the sentencing guidelines might apply to your case?
>
> **The Defendant:** Yes, sir.

> **The Court:** And do you understand that the Court will not be able to determine the guideline sentence for your case until after the Presentence Report has been completed, and you and the Government have had an opportunity to challenge the reported facts and the application of the guidelines recommended by the Probation Officer; and *the sentence imposed may be different from any estimate your attorney may have given you*?
>
> **The Defendant:** Yes, sir.
>
> **The Court:** You understand that?
>
> **The Defendant:** Yes, sir.
>
> **The Court:** Do you also understand after your guideline range has been determined *the Court has the authority to depart from the guidelines and impose a sentence that is more severe or less severe than the sentence called for by the guidelines*?
>
> **The Defendant:** Yes, sir.

Doc. 588-1, p. 9 – 11 (emphasis added)

There is a "strong presumption of verity" attached to sworn testimony at plea and sentencing proceedings; as such, the movant faces a heavy burden to show that he is entitled to relief. *See Deville v. Whitley*, 21 F.3d 654, 659 (5th Cir. 1994); *United States v. Diaz*, 733 F.2d 371, 373-74 (5th Cir. 1984). The question is whether the entry of the petitioner's guilty plea was knowing and voluntary. *Id.* To meet this burden, Mairidith must overcome the evidence of his own words. *See United States v. Raetzsch*, 781 F.2d 1149, 1151 (5th Cir. 1986) (holding that there must be independent indicia of the likely merit of the petitioner's contentions; mere contradiction of the statements made at the guilty plea proceeding will not suffice); *cf. United States v. Fuller*, 769 F.2d 1095, 1099 (5th Cir. 1985) (to be entitled to evidentiary hearing on claim that sworn statements made during the guilty plea proceeding were false, the petitioner must make "specific factual allegations supported by the affidavit of a reliable third person"). He has not done so.

As quoted above, the Plea Agreement and Plea Supplement could not be clearer, and the

colloquy during the change of plea hearing was equally clear. Mairidith acknowledged his understanding of the sentencing process – including the court's question: "And do you understand that … the sentence imposed may be different from any estimate your attorney may have given you?" Doc. 588-1, p. 10. Mairidith *twice* answered, "Yes, sir." *Id*., p. 11.

In addition, counsel's affidavit reflects a routine discussion with a criminal defendant as to the sentencing process:

> I never told Jeremy Mairidith that he would receive a sentence of no more than 60 months in prison. In Federal Court a defense lawyer can never represent to a client that he will receive a sentence of no more than a certain amount. I have never told Jeremy Mairidith or any other client of mine any such thing.
>
> I did tell Mr. Mairidith that the negotiated lesser offense carried a maximum of 240 months and since his sentence would not be a sentence strictly governed by Federal Sentence Guideline application the Court effectively had sentencing discretion from a statutory maximum of 240 months down to zero months.

Doc. 588-3, p. 1. Mr. Hill's description of the process for determining the range for a less-than-statutory maximum sentence is accurate.[5]

**Grounds 2 – 6: Challenges to Counsel's Decision Not to Pose Objections to Various Facts Used in the Guidelines Calculation**

[5] Mr. Mairidith is no stranger to the criminal justice system, though it appears from the PSR that this case represents his first *conviction* for a federal offense. Mairidith was arrested in 2014 on federal charges of felon in possession of a firearm and possession of a firearm in furtherance of a drug trafficking crime. Doc. 540, p. 18. Those charges were dismissed in 2016 upon discovery that Mairidith had requested counsel prior to being interrogated by narcotics officers, but was interrogated without counsel being present, nonetheless. *Id*. As a matter of common sense, given the serious nature of his current offense, the drug quantities, and the aggravating factors (leadership role, dangerous flight from law enforcement, the possession of a firearm, death threats against others, maintaining a dwelling for trafficking, etc.) it is implausible that Mairidith (a career criminal) would expect a sentence ranging from time served to 60 months, especially when the original maximum sentence was life.

First, the court notes that counsel raised objections to the Guidelines calculation when it appeared that the sentence would be based upon the Guidelines. However, the court later decided to impose a less than statutory maximum sentence, which does not depend upon the Guidelines calculation. Hence, as the Guidelines calculation had no application at that point, there was no purpose in raising objections regarding that calculation. Counsel noted this in his affidavit. Doc. 588-3.

This is also reflected in the court's exchange with the Probation Officer during sentencing:

**The Court:** Am I departing downward, or am I going to vary?

**Mr. Fountain:** Well, if it's below 240, it would be a variance, Your Honor.

Doc. 588-2, p. 11. Indeed, the entire point of a variance is that the district court chooses to impose a non-Guidelines-range sentence under § 3553(a):

> A "departure" is typically a change from the final sentencing range computed *by examining the provisions of the Guidelines themselves*. It is frequently triggered by a prosecution request to reward cooperation ... or by other factors that take the case "outside the heartland" contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense. A "variance," by contrast, occurs when a judge imposes a sentence above or below the otherwise properly calculated final sentencing range *based on application of the other statutory factors in 18 U.S.C. § 3553(a)*.

*United States v. McNeal*, 102 F.4th 708, 711–12 (5th Cir. 2024) (*quoting United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) (citation omitted)) (emphasis added).

**The Individual Objections Are Without Merit**

In any event, based upon the evidence available to the Government, the objections were ultimately without merit. Counsel did initially raise the objections Mairidith mentions in Grounds 2, 4, 5, and 6, though, for the reasons set forth above, counsel withdrew all the objections to the PSR. Nonetheless, as set forth in the Probation Officer's responses to the various objections to the Guidelines calculation, ample evidence exists to accept the calculation over these four objections.

In Ground 2, Mairidith argues that counsel should have objected to his designation as a leader or organizer of the conspiracy. However, the evidence shows that he directed a person to deliver drugs and retrieve money; he suggested that the same person kill an informant; he recruited another person to travel to California with him to arrange delivery of drugs; he suggested to a female participant that he would have someone "take care of" her ex-husband, and he organized the "fronting" of narcotics to individuals who sold them for him. Doc. 540, p. 11. These acts clearly show that he served as an organizer and leader within the conspiracy, though perhaps not the ultimate leader.

In Ground 4, Mairidith argues that counsel should have objected to a 2-level enhancement for possession of a dangerous weapon. Several firearms are, however, connected to him: one in the center console of his vehicle[6]; another in the nightstand at his residence. Doc. 540, p. 29. In addition, he and another conspirator discussed many firearms by telephone, and that person was found in possession of several firearms. *Id*. As part of relevant conduct, a defendant is held accountable for his own actions and those of others in a jointly undertaken criminal activity; hence, the co-conspirator's weapons can be attributed to Mairidith. Under the facts of this case, this objection is without merit.

In Ground 5, Mairidith argues that counsel should have objected to a 2-level enhancement for directing the use of violence. However, Mairidith and another conspirator discussed killing at least one informant, and, in that discussion, Mairidith directed his co-conspirator to kill the informant. *Id*., p. 6-7. In addition, Mairidith offered to help a female co-conspirator "handle" any problems with her husband, and she recognized this as a threat of violence, responding that she did not want anything to happen to the father of her children. *Id.*, p. 6. The intercept, which was entered into evidence at the

---

[6] The box for this weapon was recovered from Mairidith's residence, a fact tending to show that he was aware of its presence in his vehicle.

trial of co-conspirator, is sufficient to establish that Mairidith directed the use of violence, especially when combined with the threat to his co-conspirator's husband. An objection to that finding is without merit.

In Ground 6, Mairidith argues that counsel should have objected to 2-level enhancement for maintaining a premises for distributing a controlled substance. However, Mairidith discussed a co-conspirator bringing drugs to him at his residence; he was seen leaving his residence with a duffle bag, which he used to distribute narcotics around Tupelo; Mairidith told a co-conspirator where to find a scale at Mairidith's residence; he discussed moving a large amount of money and narcotics to his residence, and there are photographs of large amounts of cash spread across the kitchen table at Mairidith's residence. Doc. 540, p. 6, 8. This evidence establishes that Mairidith used his residence for the distribution of narcotics, as reflected in the PSR.

In Ground 3, Mairidith argues that counsel should have objected to the inclusion of certain prior marijuana convictions in tabulating criminal history points based on proposed changes to the Guidelines and the trend in various jurisdictions across the country to reduce or eliminate penalties for minor drug offenses. As the court imposed a less than statutory maximum sentence with a downward variance of 40 months under the factors in 18 U.S.C. § 3553(a) (rather than the Guidelines), the prior marijuana convictions' effect on the Guidelines Level is irrelevant. In any event, Mairidith acknowledges that his argument is based upon *proposed amendments* to the Guidelines *that were not in effect at the time of sentencing*, as well as relaxed marijuana policies of various states. As such, counsel's decision not to object to the then-current and valid Guidelines is certainly a reasonable strategic decision. This ground for relief is likewise without substantive merit.

**Ground 7: Failure to Request a Downward Departure Based on the Disparity Between the Actual Amount of Methamphetamine, Rather than the Amount of Amphetamine Mixture**

Mairidith argues in Ground 7 that counsel should have requested a downward departure because his Guidelines range should have been computed based upon the amount of methamphetamine (actual), rather than the amount of mixture and substance containing methamphetamine. The Guidelines do not, however, operate the way Mairidith posits. The rule is to calculate the offense level both ways: based upon actual amount of the substance – and also based upon the amount of the mixture. Then, having made those calculations, choose the method that yields the *greater* offense level:

> **(A)** Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level.
>
> **(B)** The terms "PCP (actual)", "Amphetamine (actual)", and "Methamphetamine (actual)" refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual). In the case of a mixture or substance containing PCP, amphetamine, or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual), amphetamine (actual), or methamphetamine (actual), whichever is greater.

U.S.S.G. 2D1.1.

As the court is required to use the calculation yielding the greater offense level, Mairidith's proposed objection would lead, at best, to the same offense level – in the case where the calculation using the mixture yielded the greater offense level. However, if the calculation using the methamphetamine (actual) yielded a greater offense level, then Mairidith's Guidelines Level would be higher – and thus less favorable to him. As requesting a calculation on this basis could not improve Mairidith's position – and might well make it worse – counsel's decision not to do so was reasonable. This ground for relief is without substantive merit.

## Conclusion

In sum, Mairidith's claims in Grounds 1 through 7 of his motion to vacate, set aside, or correct sentence will be denied. By separate order, the court will set an evidentiary hearing to decide Mairidith's claim in Ground 8 that counsel failed to file a timely notice of appeal when requested. A judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 30th day of September, 2026.

/s/Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI